UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Criminal Number:** |
| | : | |
| | : | **VIOLATION:** |
| | : | |
| v. | : | **Count One** |
| | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| ROBERT W. NEY, | : | |
| | : | **Count Two** |
| Defendant. | : | **18 U.S.C. §§ 1001 and 2** |
| | : | **(False Statement)** |

## INFORMATION

The United States charges that:

## COUNT ONE
### 18 U.S.C. § 371 - Conspiracy

### GENERAL ALLEGATIONS

Congressman Robert W. Ney

1.     From January 1995 to the present, Defendant ROBERT W. NEY served as an elected

member of the U.S. House of Representatives for the 18th Congressional District in Ohio.

From January 2001 until mid-January 2006, NEY served as the appointed Chairman of

the House Committee on Administration ("House Administration Committee").

Beginning in or about January 2003, NEY also served as Chairman of the Housing and

Community Opportunity Subcommittee of the House Financial Services Committee

("Housing Subcommittee") and the Chairman of the Joint Committee on Printing.

Ney's Staff

2.     From in or about January 1995 through in or about February 2002, Neil Volz was

employed as Communications Director and then Chief of Staff to NEY.  From January

2001 until February 2002, Volz was also the Staff Director for the House Administration Committee. In February 2002, Volz left the public sector and went to work with Jack Abramoff as a lobbyist.

3. From in or about September 2001 until in or about February 2002, a Congressional staffer ("Staffer C") worked as NEY's Executive Assistant on the House Administration Committee. Beginning in or about February 2002, Staffer C succeeded Volz as NEY's Chief of Staff.

The Lobbyists and Their Clients

4. Beginning in or about 1994 and continuing until March 2004, Jack Abramoff was a lobbyist in Washington, D.C. Abramoff represented Native American Indian Tribes, Commonwealths, foreign governments, businesses, and individuals, primarily in matters involving the United States Congress and federal departments and agencies. A significant portion of his work involved lobbying Members of Congress on behalf of Native American Indian Tribes operating or interested in operating gambling casinos throughout the United States. At various times from 2000 to approximately 2005, Abramoff owned or controlled a number of business interests, including a boat-based casino business in Florida and a Washington, D.C. restaurant, Signatures. During the same time, Abramoff controlled luxury box suites in the MCI Center Arena in Washington, D.C. (now known as the Verizon Center), FedEx Field in Maryland, and Camden Yards Stadium in Maryland.

5. In 1998, Michael Scanlon left his job as the Communications Director for a Member of the House of Representatives and began working for a company providing grass roots

2

and public relations services. In or about March 2000, Scanlon joined Abramoff working for the Washington D.C. office of a law and lobbying firm. In or about March 2001, Scanlon formed his own company, Capital Campaign Strategies, through which he and Abramoff sought clients for both lobbying and grass roots services.

6.     From 1998 until December 2000, Tony Rudy worked as the Deputy Chief of Staff in the leadership office of a Member of the House of Representatives. In or about January 2001, Rudy left the public sector to work as a lobbyist with Abramoff, a position he held through July 2002.

The Foreign Businessman

7.     Beginning at least as early as January 2003, a foreign businessman (the "Foreign Businessman") owned and operated a business with offices in London, England, and through which the Foreign Businessman sought to sell U.S.-made airplanes and airplane parts to a certain foreign country. U.S. laws prohibited, at all times relevant to this Information, the exportation or sale of U.S.-made airplanes and airplane parts to this foreign country. The Foreign Businessman sought an exemption to or modification of these laws as well as a visa for travel to the United States.

Rules of the House of Representatives

8.     At all relevant times, the Rules of the House of Representatives:

a.     prohibited gifts to Members of Congress and staff members of more than $50 at one time, and a total of $100 per year from one source, except under limited circumstances;

b.  required that an exemption be sought from the Ethics Committee to receive more than $250 worth of gifts annually from a person the member considered a personal friend.  NEY neither sought nor received such an exemption for gifts from Abramoff, his lobbyists, or the Foreign Businessman;

c.  required that Members of the House and staff members at or above a certain salary threshold publicly file and certify as true and accurate Annual Financial Disclosure Statements with the Clerk of the House reporting detailed financial information;

d.  prohibited trips paid for by private sources, unless the trip had an official purpose, and prohibited all trips paid for by lobbyists regardless of the purpose; and

e.  required that Travel Disclosure Forms containing detailed information about the purpose, cost and sponsor of any trip paid for by private sources be publicly filed with the Clerk of the House within 30 days after any trips taken by Members of Congress or their staff and paid for by private entities or persons.  The Rules also required that each Travel Disclosure Form be signed by the Member for Member travel or by the staffer and Member for staff travel, with a certification that the trip was in connection with official duties and that it "would not create the appearance ... of using public office for private gain."

Federal Election Commission Filings

9.  From at least in or about January 2000 through at least in or about August 2006, NEY controlled an election committee known as "Bob Ney for Congress."

4

10.   From on or about April 13, 2001 through at least in or about August 2006, NEY

      controlled a political action committee known as "American Liberty PAC."

11.   The Federal Election Campaign Act of 1971 as amended (the "FECA") requires that

      federal candidates and political action committees file periodic reports of their financial

      and fundraising activity with the Federal Election Commission ("FEC"). Specifically,

      the FECA requires committees to report both monetary and in-kind contributions. "In-

      kind" contributions are payments by third parties for things of value that benefit a

      committee, such as the facility rental and catering costs paid for by a third party hosting a

      fundraiser for a committee. The FECA establishes limits on the value of contributions,

      both monetary and in-kind, that a committee may receive from any one source.

12.   Both Bob Ney for Congress and American Liberty PAC filed periodic reports of their

      financial and fundraising activity. NEY exercised final control and authority over the

      FEC filings for both entities by, among other things, requiring that his staff provide draft

      filings for his review and obtain his approval before filing FEC reports.

### THE CONSPIRACY AND ITS OBJECTS

13.   From in or about January 2000 through at least in or about April 2004, in the District of

      Columbia and elsewhere, the Defendant,

### ROBERT W. NEY,

      did knowingly conspire, confederate and agree with Abramoff, Staffer C, Rudy, Scanlon,

      Volz, the Foreign Businessman, and other persons known and unknown to the United

      States to commit offenses against the United States, that is, to:

5

a.    devise a scheme and artifice to defraud and deprive the House of Representatives,
the citizens of the 18th Congressional District of Ohio, and the people of the
United States of their right to the honest services of Representative NEY, as well
as the honest services of Staffer C and Volz while they worked for NEY,
performed free from deceit, fraud, concealment, bias, conflict of interest, self-
enrichment and self-dealing, and to use the mails and interstate wires in
furtherance, in that NEY and his staff accepted from Abramoff and lobbyists
working with Abramoff (collectively referred to as "his lobbyists"), and the
Foreign Businessman a stream of things of value intending to be influenced to
take and to be rewarded for taking a stream of favorable official action by NEY
and his staff, in violation of 18 U.S.C. §§ 1341, 1343, 1346 and 2;

b.    knowingly and willfully make false statements to the U.S. House of
Representatives regarding the things of value NEY received from Abramoff, his
lobbyists, and the Foreign Businessman in violation of 18 U.S.C. §§ 1001 and 2;
and

c.    knowingly and willfully cause Volz to violate the one-year ban against lobbying
by former Congressional employees by encouraging, soliciting and permitting
him to lobby NEY and his staff, and staff members of the House Administration
Committee of which NEY was chairman, within one year of having been
employed by the House Administration Committee and the Office of
Representative NEY, knowing that Volz intended to influence them to take
official action on behalf of other persons, in violation of 18 U.S.C. §§ 207 and 2.

6

## PURPOSE OF THE CONSPIRACY

14.     It was a purpose of the conspiracy for NEY, Staffer C, and Volz to enrich themselves and NEY's staff by using and agreeing to use their official positions and by performing and agreeing to perform official acts in return for a stream of things of value flowing to NEY and his staff by Abramoff, his lobbyists, and the Foreign Businessman.

15.     It was a further purpose of the conspiracy for NEY and his staff to enrich Abramoff, his lobbyists, and the Foreign Businessman by providing favorable action to them and their clients.

16.     It was a further purpose of the conspiracy to conceal from the House of Representatives, the citizens of the 18th Congressional District of Ohio, and the people of the United States the things of value NEY and his staff received from Abramoff, his lobbyists and the Foreign Businessman, to conceal the manner and the degree to which NEY and his staff were enriched by Abramoff, his lobbyists, and the Foreign Businessman, and to conceal the ways in which NEY and his staff had used and offered to use their official positions to benefit Abramoff, his lobbyists, and the Foreign Businessman.

## MANNER AND MEANS

17.     The conspiracy was carried out through the following manner and means:

   a.     NEY, Staffer C, and Volz when he worked for NEY, solicited and accepted a stream of things of value from Abramoff and his lobbyists, including overseas and domestic trips, meals and drinks, golf, tickets to professional sporting events and concerts, a job for Volz as a lobbyist, and monetary and in-kind campaign contributions from Abramoff, his lobbyists, and their clients.  After joining

7

Abramoff's law and lobbying firm, Volz provided things of value to NEY and

Staffer C. NEY controlled the receipt of things of value by his personal office

staff and the House Administration Committee staff as a way to reward and

punish staff by approving their receipt of things of value or by taking things of

value and redistributing them to others.

b.　　　In exchange for this stream of things of value, NEY and his staff provided and

agreed to provide a stream of favorable official action to, and to use their

influence on behalf of, Abramoff, his lobbyists, and their clients, none of whom

were Ohio-based.

c.　　　NEY, intending to be influenced to perform official acts, solicited and accepted

things of value from the Foreign Businessman, including thousands of dollars

worth of gambling chips.

d.　　　NEY and his staff concealed the things of value they received from Abramoff, his

lobbyists, and the Foreign Businessman by failing to report them or by

misrepresenting their nature and value, in contravention of the disclosure

requirements contained in federal statutes and the Rules of the House of

Representatives, and by NEY's failure to report fully and accurately the in-kind

campaign contributions Abramoff and his lobbyists gave.

e.　　　Within one year of having served as NEY's chief of staff and the staff director to

the House Administration Committee, Volz joined Abramoff's lobbying practice

and provided things of value to NEY and Staffer C, and asked them and other

members of the staff in NEY's personal office as well as the House

8

Administration Committee to provide official support and influence to aid the

clients of Volz, Rudy, and Abramoff.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its purposes, NEY and the co-conspirators

committed the following overt acts, among others, in the District of Columbia and elsewhere:

### NEY Solicited and Accepted a Stream of Things of Value
### from Abramoff and His Lobbyist Associates with the Intent to be Influenced

18.     From in or about January 2000 until March 2004, NEY and his staff regularly accepted

meals and drinks paid for by Abramoff and his lobbyists.  For example, from March 2002

through October 2002, which is the time during which NEY repeatedly agreed to take

official action to insert various amendments into election reform legislation at

Abramoff's request, Volz treated NEY and his staff to more than $6,400 worth of meals

and drinks at Signatures.  Volz sought and received reimbursement from Abramoff's

lobbying firm for his expenses.

19.     From in or about January 2000 until March 2004, NEY and his staff received numerous

expensive tickets to sports and entertainment events in the Washington, D.C., area.  For

example, from March 2002 through October 2002, which is the time during which NEY

repeatedly agreed to take official action to insert various amendments into election

reform legislation at Abramoff's request, NEY received two tickets to a classical music

concert and NEY and his staff received tickets to a sought-after rock music concert, with

the total costs for the tickets on those two occasions exceeding $1,100.  NEY controlled

the receipt and use of the rock concert tickets by his staff.

20.  From in or about June 2000 until March 2004, NEY and the election committees he
controlled received tens of thousands of dollars in campaign contributions from
Abramoff and his clients, for whom NEY had agreed to or would agree to perform
official acts.  For example, in exchange for NEY's agreement to insert language into
legislation that would allow a Native American Indian Tribal client of Abramoff's
("Texas Tribe #1") to open a casino in Texas, Abramoff caused Texas Tribe #1 to
contribute $32,000 in campaign contributions to NEY, including a $25,000 contribution
to the soft money account of the American Liberty PAC, a $5,000 contribution to the
hard money account of the American Liberty PAC, and a $2,000 contribution to Bob Ney
for Congress.

21.  From approximately January 2001 until March 2004, NEY and the election committees
he controlled received in-kind campaign contributions in the form of free use of and
catering for Abramoff's luxury box suites at the MCI Center Arena and Camden Yards
Stadium or Signatures restaurant on at least eight occasions for political fundraisers,
which use was not properly reported to the FEC as required by law.  For example, on or
about April 10, 2002, which is during the time when NEY repeatedly agreed to take
official action to insert various amendments into election reform legislation at
Abramoff's request, NEY and his American Liberty PAC received free use of a private
room at Signatures for a fundraiser, the $2,000 cost for which was paid by Volz,
reimbursed through Abramoff's firm, and not reported to the FEC.

22.  From on or about August 3 through on or about August 9, 2002, NEY, Staffer C and
another NEY staff member joined Abramoff, Volz and four others on an all-expense-paid

trip to Scotland to play golf on world famous courses. As NEY knew, the all-expense-paid trip was a golf vacation paid for in part by funds raised by Texas Tribe #1. The trip included a private jet from Maryland to Scotland and from Scotland to London, commercial airline tickets to return to Washington, D.C., from London, luxury accommodations in Scotland and London, daily golf at St. Andrews and other famous courses in Scotland, meals, drinks, and local transportation. The trip costs for the entire group exceeded $160,000, without including the airline tickets NEY purchased with government funds to fly from near his home in Ohio to the Washington, D.C. area, where NEY boarded the private jet for Scotland.

23.    From on or about May 9, 2003 through on or about May 12, 2003, NEY and Staffer C traveled with Volz and another lobbyist to New Orleans for an all-expense-paid, three-night stay, which included a visit on the final day to the reservation of one of Abramoff's Native American Tribal clients in Louisiana. The trip costs for the group exceeded $7,200, the cost of which was reimbursed through Abramoff's lobbying firm.

24.    From on or about August 24, 2003 through on or about August 27, 2003, NEY, Staffer C, and another NEY staff member spent a two-night vacation at the Sagamore Resort in Lake George, New York, with Volz and another lobbyist paying for more than $3,500 in expenses incurred for lodging, a boat rental, a chartered town car, meals, drinks, and golf. Volz's share of the costs was reimbursed through Abramoff's lobbying firm.

**NEY Took a Series of Official Acts, In Exchange for the Stream of Things of Value, to Assist Abramoff, His Lobbyists, and Their Clients**

25. In or about March 2000 and in or about October 2000, NEY agreed to insert statements into the Congressional Record at Scanlon's request, which supported Abramoff's business interests.

26. From in or about April 2001 through in or about November 2002, NEY supported the application of and ultimately issued a license to one of Abramoff's lobbying clients, allowing that client to win a multi-million dollar contract with wireless telephone companies to install wireless telephone infrastructure in the House of Representatives. NEY took a variety of official action to aid Abramoff's wireless services client, including meeting with representatives of the client on or about May 10, 2001, leaking to Abramoff a copy of a letter from the client's competitor complaining about the selection process in or about September 2002, and issuing a licence to Abramoff's client on or about November 26, 2002.

27. On repeated occasions in 2002 and 2003, NEY contacted personnel in United States Executive Branch agencies and offices in an effort to influence decisions of those agencies and offices at the request of Abramoff and his lobbyists, including advancing the interests of Abramoff's Native American Indian Tribal clients to the Secretary of Housing and Urban Development ("HUD") in a meeting in or about January 2003, wherein NEY told the HUD Secretary that NEY's number one priority as the newly installed Chairman of the Housing Subcommittee was Native American Indian Tribal housing.

28.    From on or about March 20, 2002, through at least on or about October 4, 2002, NEY

agreed that, as the Co-Chairman of a Conference Committee of House and Senate

Members of Congress involving election reform legislation known as the Help America

Vote Act ("HAVA"), he would insert a variety of amendments into the HAVA at

Abramoff's request as follows:

    a.    on or about March 20, 2002, NEY agreed to insert an amendment to lift an

       existing federal ban against commercial gaming by a Texas Native American

       Tribal client of Abramoff ("Texas Tribe #1");

    b.    in or about July 2002, NEY agreed to insert an amendment to lift an existing

       federal ban against commercial gaming by another Texas Native American Tribe

       ("Texas Tribe #2");

    c.    in or about June 2002, NEY agreed to insert an amendment to allow a foreign-

       beverage-distiller client of Abramoff's lobbying firm to label its product as

       "Made in Russia" when that client's product was to be distilled in a former Soviet

       Republic; and

    d.    in or about July 2002, NEY agreed to insert an amendment causing the General

       Services Administration to transfer property in its inventory to a religious school

       founded by Abramoff.

29.    As part of his agreement to insert an amendment into the HAVA on behalf of Texas Tribe

#1, NEY agreed to take and took a variety of official action to aid Texas Tribe #1,

including on or about August 14, 2002, returning to Washington, D.C., from Ohio during

the August Congressional recess and at tax-payer expense in order to meet with

representatives of Texas Tribe #1 and assure them that he was continuing to work to insert their amendment into the HAVA; on or about October 8, 2002, participating in an interstate telephone conference call with representatives of Texas Tribe #1 in order to assure them that he would continue to support their pursuit of an amendment to another piece of legislation; and in or about February 2003, agreeing to ask the chairman of another committee of the House of Representatives to insert into different legislation the amendment lifting the gaming ban for Texas Tribe #1.

### NEY Solicited and Accepted Things of Value from the Foreign Businessman Intending to be Influenced and Took Official Action In Return

30.    From in or about February 20, 2003, through in or about February 23, 2003, NEY and one of his staff members traveled to London to meet with the Foreign Businessman and others to discuss their need for official assistance to obtain an exemption from or an amendment to the United States laws making it illegal to do business with a foreign country, which thwarted the Foreign Businessman's ability to engage in lucrative sales of U.S.-made airplanes and airplane parts. NEY and his staff member were treated by the Foreign Businessman to free luxury accommodations, airfare, and entertainment.

31.    On or about February 21, 2003, NEY met with the Foreign Businessman and others and discussed obtaining an exemption to the laws prohibiting the sale of U.S.-made airplanes and airplane parts to a foreign country as well as the Foreign Businessman's need for a visa to enter the United States. NEY agreed to help the Foreign Businessman with both the exemption and the visa.

32.    On or about February 21, 2003, and again on or about February 22, 2003, the Foreign Businessman provided to NEY, his staff member, and others on multiple occasions

14

thousands of dollars worth of gambling chips for use at various private casinos of which the Foreign Businessman was a member and to which the Foreign Businessman accompanied NEY and his staff member. NEY never returned any of the free chips to the Foreign Businessman and never shared with the Foreign Businessman any of the money NEY had won as a result of the thousands of dollars worth of chips that the Foreign Businessman had given to NEY. NEY carried into the United States at least $3,250 worth of British pounds he had obtained during the February trip.

33.    During the February trip, the Foreign Businessman also gave NEY and his staff member a free membership to one of the private casinos.

34.    Following the February 2003 trip, at the request of the Foreign Businessman, NEY contacted the State Department to inquire about obtaining a visa for travel to the United States on behalf of the Foreign Businessman.

35.    Following the February 2003 trip, at the request of the Foreign Businessman, NEY contacted the State Department to inquire about an exemption to the United States embargo against doing business with a foreign country.

36.    In or about July or August 2003, NEY arranged for himself, the same staff member from the February 2003 London trip, and Staffer C to meet with the Foreign Businessman during a stopover in London so that they could gamble with the Foreign Businessman and receive chips from him.

37.    On or about August 29, 2003, NEY traveled to London with Staffer C and the other staff member and the Foreign Businessman again provided to both NEY and his staff thousands of dollars worth of gambling chips for use at various private casinos. NEY

never returned any of the free chips to the Foreign Businessman and never shared with

the Foreign Businessman any of the money NEY had won as a result of the thousands of

dollars worth of chips that the Foreign Businessman had given to NEY. NEY imported

into the United States approximately $47,000 worth of British pounds he had obtained

from gambling with the Foreign Businessman on August 29, 2003.

### NEY Intentionally Concealed his Relationship with Abramoff and the Foreign Businessman from the U.S. House of Representatives and the Public

38.    On or about September 9, 2002, NEY caused to be prepared and signed his Member

Travel Disclosure Form for the August 2002 Scotland golf trip, substantially under

reporting the costs paid by a private source for transportation, lodging and meals, and

failing to report any costs paid for by a third party for golf expenses. Even though the

trip was a golfing vacation, NEY reported that the purpose of the trip was a "speech to

Scottish parliamentarians; attend Edinburgh Military Tattoo; visit British Parliament."

NEY never gave a speech to Scottish Parliamentarians, did not visit British Parliament,

and attended the Edinburgh Military Tattoo only as a tourist with no official duties or

responsibilities.

39.    On or about March 11, 2003, NEY signed and caused to be filed a Member Travel

Disclosure Form for the February 2003 London trip in which he falsely reported that no

other expenses had been paid by private sources, notwithstanding his receipt of thousands

of dollars worth of gambling chips from the Foreign Businessman.

40.    On or about May 15, 2003, NEY caused to be filed his Annual Financial Disclosure

Statement for calendar year 2002 in which he misrepresented the Scotland golf trip as

16

being for an official purpose. NEY also failed to disclose as gifts the golf expenses from the Scotland trip as well as the tickets, meals and entertainment provided by Abramoff, Volz, and other lobbyists working with Abramoff.

41. On or about August 30, 2003, to conceal the true amount of money obtained by NEY during his August 2003 trip to gamble with the Foreign Businessman in London, NEY gave approximately $5,000 worth of British pounds to a staff member to carry through customs so that NEY could carry and report a lower dollar amount to U.S. Customs Officials upon reentry into the United States.

42. On or about August 30, 2003, NEY completed a Customs Service Form 4790, Report of International Transportation of Currency or Monetary Instruments, in which he reported importing $32,000, failing to include thousands of additional dollars he had received and was carrying as well as approximately $5,000 in British pounds that NEY had given to his staff member to carry through U.S. Customs.

43. On or about May 15, 2004, NEY caused to be filed his Annual Financial Disclosure Statement for 2003 in which he failed to disclose the tickets, meals and entertainment provided by Abramoff, Volz, and other lobbyists working with Abramoff, including the gifts of free travel, accommodations, and other expenses associated with the trip that NEY took to Lake George, New York, and the trip to New Orleans, Louisiana. The Statement also understated and misrepresented his receipt of gifts from the Foreign Businessman by reporting that he won $34,000 from a "Game of Chance[,] Casino[,] Ambassador's Club," but failed to disclose thousands of dollars worth of gambling chips among other gifts from the Foreign Businessman as well as the approximately $5,000 that he had given to his staff member to carry through customs on August 30, 2003.

17

**NEY Knowingly and Willfully Aided and Abetted Volz's One-Year Ban Violation**

44.    In or about November 2001, NEY reviewed with Volz the clients Volz told Abramoff

that Volz could bring to Abramoff's lobbying firm.  NEY encouraged Volz to add as a

potential client a company with business before the Joint Committee on Printing, which

NEY chaired.

45.    Beginning in or about mid-August 2002 and continuing at various times throughout his

one-year ban, Volz contacted NEY and senior staff members of the House

Administration Committee to seek support for transferring property held by the General

Services Administration to a private school Abramoff operated.  NEY agreed to help

Abramoff with that effort, including by agreeing to insert an amendment into the HAVA

and later by offering to call a senior official at GSA.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### 18 U.S.C. § 1001
### False Statements on 2002 and 2003 Annual Financial Disclosure Forms

46.    Paragraphs 1 through 12, and 18 through 45 of Count One are realleged as though fully

stated herein.

47.    On or about May 15, 2003, and on or about May 17, 2004, in the District of Columbia

and elsewhere, in a matter within the administrative jurisdiction of the legislative branch

of the United States, including the jurisdiction of the United States House of

Representatives, the Defendant,

### ROBERT W. NEY,

aided and abetted by Abramoff, Staffer C, Volz, and others, knowingly and willfully

made materially false, fictitious and fraudulent statements and representations to the

House of Representatives in NEY's Annual Financial Disclosure Statement for calendar

years 2002 and 2003 regarding the things of value he had received from Abramoff, his

lobbyists, and the Foreign Businessman in that:

a.    Annual Financial Disclosure Statement for 2002:  (1) NEY wrote that the source

of travel payments and reimbursements for his August 2002 golf trip to Scotland

was the "National Center for Public Policy" when, as NEY then and there well

knew and believed, Abramoff and his clients had paid for NEY's expenses; and

(2) NEY omitted the reporting of gifts totaling $285 or more from any source,

including gifts from Abramoff and his lobbyists, writing that NEY had received

"-NONE-" when, as NEY then and there well knew and believed, Abramoff and

Volz had each given to NEY gifts valued at well more than $285 in 2002; and

19

b.    Annual Financial Disclosure Statement for 2003: (1) NEY failed to report gifts

totaling $285 or more from Abramoff and Volz when, as NEY knew and

believed, Abramoff and Volz had each given to NEY gifts valued at well more

than $285 in 2003; and (2) NEY wrote that he had received $34,000 as a gift from

"Game of Chance[,] Casino[,] Ambassador's Club" when, as NEY knew and

believed, NEY had received more than $34,000 in gambling chips and winnings

and the true source of the money NEY received was the Foreign Businessman.

All in violation of Title 18, U.S.C. §§ 1001(a)(2), (c)(1) and 2.


EDWARD C. NUCCI
Acting Chief, Public Integrity Section


PAUL E. PELLETIER
Acting Chief, Fraud Section


Mary K. Butler
James A. Crowell IV
M. Kendall Day
Trial Attorneys

Date: September 15 2006