ATTACHMENT A

FACTUAL BASIS FOR THE PLEA
OF ROBERT W. NEY

This statement is submitted to provide a factual basis for my plea of guilty to the conspiracy and false statement charges filed against me.

Congressman Robert W. Ney

1. From January 1995 to the present, ROBERT W. NEY, served as an elected member of the U.S. House of Representatives for the 18th Congressional District in Ohio. From January 2001 until he resigned as Chairman in mid-January 2006, NEY served as the appointed Chairman of the House Committee on Administration ("House Administration Committee"). Beginning in January 2003, NEY also served as Chairman of the Housing and Community Opportunity Subcommittee of the House Financial Services Committee and the Chairman of the Joint Committee on Printing. On repeated occasions from in or about 2000 through at least April 2004, NEY communicated with his coconspirators in furtherance of their conspiracy using interstate electronic email, interstate telephone calls, and government and commercial mail carriers.

NEY's Staff

2. From January 1995 through February 2002, Neil Volz was employed as Communications Director and then Chief of Staff for NEY. From January 2001 until February 2002, Volz was also the Staff Director for the House Administration Committee. In February 2002, Volz left the public sector and went to work with Jack Abramoff as a lobbyist.

3. From September 2001 until February 2002, a Congressional staffer worked as NEY's Executive Assistant on the House Administration Committee ("Staffer C"). Beginning in February 2002, Staffer C succeeded Volz as NEY's Chief of Staff.

The Lobbyists and Their Clients

4.  Beginning in 1994 and continuing until March 2004, Jack Abramoff was a lobbyist in Washington, D.C. Abramoff represented Native American Indian Tribes, Commonwealths, foreign governments, businesses, and individuals, primarily in matters involving the United States Congress and federal departments and agencies. A significant portion of Abramoff's work involved lobbying Members of Congress on behalf of Native American Indian Tribes operating or interested in operating gambling casinos throughout the United States. At various times from 2000 until approximately 2005, Abramoff owned or controlled a number of other business interests, including a boat-based casino business in Florida and a Washington, D.C. restaurant, Signatures. Abramoff also controlled luxury box suites at the MCI Center Arena in Washington, D.C. (now known as the Verizon Center), FedEx Field in Maryland, and Camden Yards Stadium in Maryland.

5.  In 1998, Michael P.S. Scanlon left his job as the Communications Director for a Member of the House of Representatives and began working for a company providing grass roots and public relations services. In March 2000, Scanlon joined Abramoff at the Washington, D.C., office of a law and lobbying firm. In or about March 2001, Scanlon formed his own company, Capital Campaign Services, through which he and Abramoff sought clients for both lobbying and grass roots services.

6.  From 1998 until December 2000, Tony C. Rudy worked as the Deputy Chief of Staff in the leadership office of a Member of the House of Representatives. In January 2001, Rudy began working with Abramoff as a lobbyist, a position he held through July 2002.

2

The Foreign Businessman

7.  Beginning at least as early as January 2003, a foreign businessman (the "Foreign Businessman") owned and operated a business with offices in London, England, and through which the Foreign Businessman sought to sell U.S.-made airplanes and airplane parts abroad. The Foreign Businessman hired Washington, D.C., based lobbyists to pursue an exemption to or modification of United States laws prohibiting the sale of these planes and parts to businesses in a foreign country. He also sought a visa to enter the United States.

NEY's Scheme to Defraud the House of Representatives
and the Public of His Honest Services

8.  Beginning in or about 2000 and continuing through April 2004, NEY and his coconspirators, using mail and interstate wire communications, engaged in a conspiracy to deprive the public of the honest services of NEY and members of his staff, to commit false statements, and to aid and abet Volz's violation of his one-year lobbying ban. That is, NEY and members of his staff corruptly solicited and accepted a stream of things of value from Abramoff, Scanlon, Volz, Rudy, and other lobbyists working for Abramoff (collectively referred to as "Abramoff and his lobbyists") and the Foreign Businessman with the intent to be influenced and induced to take a series of official actions and to agree to perform a series of official actions. Abramoff and his lobbyists, the Foreign Businessman, and others provided the stream of things of value knowing that it was received by NEY and members of his staff with the intent to be influenced and induced to take official action.

9. As part of the conspiracy described in paragraph 8, the stream of things of value solicited and accepted by NEY and paid for by Abramoff and his lobbyists and their clients in exchange for the stream of official action, included, but was not limited to, the following:

 a. all-expense-paid and reduced-price trips to play golf with seven others in Scotland in August 2002, with total trip costs exceeding $160,000; to gamble and vacation with three others in New Orleans in May 2003, with total trip costs of approximately $7,200; and to vacation with four others at Lake George, New York in August 2003, with trip costs paid by the lobbyists exceeding $3,500;

 b. numerous meals and drinks at Washington, D.C., area restaurants, primarily at Signatures;

 c. numerous tickets for NEY and his staff to use Abramoff's box suites to attend sporting events and concerts in the Washington, D.C., area. NEY controlled the receipt and use of tickets by his staff;

 d. substantial campaign contributions from Abramoff's clients for whom NEY had agreed to perform official acts; and

 e. in-kind campaign contributions in the form of the free use of, catering for, and tickets to Abramoff's luxury box suites at the MCI Center Arena and Camden Yards Stadium or Signatures restaurant on at least eight occasions for political fundraisers, which use was not properly reported to the Federal Election Commission as required by law.

10. As part of the conspiracy described in paragraph 8 and in exchange for the stream of things of value, NEY took and agreed to take a stream of official action benefitting

4

Abramoff and his lobbyists and their clients, none of whom were Ohio-based. The stream of official action taken or agreed to be taken by NEY included, but was not limited to, the following:

a. NEY agreed to and did garner support for, support, and oppose legislation at Abramoff's request, including agreeing to insert amendments at Abramoff's request into the election reform legislation known as the Help America Vote Act ("HAVA"), specifically the following:

    i. on March 20, 2002, an amendment to lift an existing federal ban against commercial gaming by a Texas Native American Tribal client of Abramoff ("Texas Tribe #1");

    ii. in July 2002, an amendment to lift an existing federal ban against commercial gaming by another Texas Native American Tribe ("Texas Tribe #2");

    iii. in June 2002, an amendment to allow a foreign-beverage-distiller client of Abramoff's lobbying firm to label its product as "Made in Russia" when that client's product was to be distilled in a former Soviet Republic; and

    iv. in July 2002, an amendment causing the General Services Administration to transfer property in its inventory to a religious school founded by Abramoff; and

b. In March 2000 and again in October 2000, NEY agreed to and did insert statements into the <u>Congressional Record</u> at Scanlon's request;

    c.    From April 2001 through November 2002, NEY supported the application of and ultimately issued a license to one of Abramoff's lobbying clients, allowing that client to win a multi-million dollar contract with wireless telephone companies to install wireless telephone infrastructure in the House of Representatives;

    d.    At various times from 2001 through 2003, NEY contacted personnel in United States Executive Branch agencies and offices in an effort to influence decisions of those agencies and offices at the request of Abramoff and his lobbyists, including meeting with the Secretary of Housing and Urban Development and identifying as NEY's number one priority Native American Indian Tribal housing; and

    e.    From 2001 through 2003, NEY met with and praised Abramoff and his lobbyists to clients, both actual and potential, in an effort to maintain and enhance Abramoff's lobbying practice.

11.    As part of the conspiracy described in paragraph 8, the things of value solicited and accepted by NEY from the Foreign Businessman and the official action agreed to and taken by NEY on behalf of the Foreign Businessman included, but were not limited to, the following:

    a.    From February 20, 2003, through February 23, 2003, NEY and one of his staff members traveled to London to meet with the Foreign Businessman, his partner, and others. The round-trip airfare, luxury accommodations, meals and entertainment for NEY and his staff member was paid for by the Foreign Businessman's company.

b. On February 21, 2003, NEY and his staff member met with the Foreign Businessman and discussed various strategies to alter the United States laws prohibiting the Foreign Businessman from selling airplanes and parts in a foreign country. NEY also discussed with the Foreign Businessman his need for a visa to enter the United States.

c. On February 21 and again on February 22, 2003, NEY and his staff member each received from the Foreign Businessman thousands of dollars worth of gambling chips for use at various private casinos of which the Foreign Businessman was a member and to which the Foreign Businessman accompanied NEY and his staff member. NEY and his staff member also received free membership to one of the private casinos. NEY never returned any of the free chips to the Foreign Businessman and never shared with the Foreign Businessman any of the money NEY had won as a result of the thousands of dollars worth of chips that the Foreign Businessman had given to NEY. NEY received at least $3,250 worth of British pounds during the February trip.

d. Following the February 2003 trip, on behalf of the Foreign Businessman, NEY contacted the State Department to inquire about obtaining a visa for travel to the United States on behalf of the Foreign Businessman.

e. Following the February 2003 trip, on behalf of the Foreign Businessman, NEY contacted the State Department to inquire about the status of U.S. laws prohibiting the sale of U.S.-made airplanes and airplane parts to a foreign country.

f.  In July or August 2003, NEY arranged for himself, the same staff member from the February 2003 London trip, and Staffer C to meet with the Foreign Businessman during a stopover in London so that they could gamble with him and receive free chips from him.

g.  On August 29, 2003, NEY, Staffer C, and the other staff member traveled to London for a one-night stopover and the Foreign Businessman again furnished NEY and each of his staff members with thousands of dollars worth of gambling chips for use at various private casinos. NEY never returned any of the free chips to the Foreign Businessman and never shared with the Foreign Businessman any of the money NEY won as a result of the thousands of dollars worth of chips that the Foreign Businessman had given to NEY. At the end of the evening, NEY received approximately $47,000 worth of British pounds.

h.  On August 30, 2003, to conceal the true amount of money NEY had received, NEY gave approximately $5,000 worth of British pounds to a staff member to carry through the U.S. Customs Service checkpoint so that NEY could carry and report a lower dollar amount to Customs Service officials upon reentry into the United States.

i.  On August 30, 2003, NEY completed a Customs Service Form 4790, Report of International Transportation of Currency or Monetary Instruments, on which NEY reported importing $32,000, which failed to include thousands of additional dollars that NEY had received in London, including approximately $5,000 worth of British pounds that NEY had given to his staff member to carry through Customs.

NEY's Concealment of His Corrupt Scheme
from the House of Representatives and the Public

12. As part of the conspiracy described in paragraphs 8 through 11 and the substantive false statement violations set forth in counts 2 and 3 of the Information, NEY knowingly concealed and misrepresented his receipt of the stream of things of value from Abramoff, Volz, Rudy, Scanlon, the Foreign Businessman, and others by, among other things, falsifying the following forms:

   a. Travel Disclosure Forms

       i. NEY's August 2002 trip to Scotland: On September 9, 2002, NEY signed and eventually caused to be filed his Member Travel Disclosure Form for the August 2002 Scotland golf trip. On that form, NEY substantially under reported the costs paid by Abramoff and his clients and mischaracterized the purpose of the trip.

       ii. NEY's February 2003 trip to London: On March 11, 2003, NEY signed and caused to be filed a Member Travel Disclosure Form for the February 2003 London trip in which NEY falsely reported that no other expenses had been paid by private sources, notwithstanding NEY's receipt of thousands of dollars worth of gambling chips from the Foreign Businessman.

   b. Annual Financial Disclosure Forms

       i. NEY's 2002 Financial Disclosure Form: On May 15, 2003, NEY signed and caused to be filed his Annual Financial Disclosure Statement for calendar year 2002 in which NEY mischaracterized the purpose of the

        trip, and failed to disclose as gifts the golf expenses from the Scotland trip as well as the tickets, meals and entertainment provided by Abramoff, Volz, and other lobbyists working with Abramoff. On June 2, 2003, and again on June 18, 2004, NEY filed amended financial disclosure forms for calendar year 2002, in which NEY made the same material false statements and omissions as with the original filing.

    ii.    NEY's 2003 Financial Disclosure Form: On May 15, 2004, NEY signed and caused to be filed an Annual Financial Disclosure Statement for 2003 in which NEY failed to disclose the trips, tickets, meals and entertainment provided by Abramoff, Volz, and other lobbyists working with Abramoff, including the gifts of free travel, accommodations, and other expenses associated with the trips that NEY took to Lake George, New York; and New Orleans, Louisiana. NEY also understated his receipt of gifts and omitted as the source of those gifts the Foreign Businessman by reporting that he won $34,000 from "Game of Chance[,] Casino[,] Ambassador's Club." NEY intentionally failed to include thousands of additional dollars he received, including an additional $3,250 he received in February 2003 and $5,000 worth of British pounds carried through the U.S. Customs Service checkpoint by his staff member.

## NEY's Aiding and Abetting Volz's One-Year Lobbying Ban Violation

13.    As part of the conspiracy described in paragraphs 8 through 11, NEY allowed and encouraged Volz to lobby NEY, the staff in NEY's personal office, and the staff on the

House Administration Committee on a variety of issues from February 2002 through February 2003, knowing that Volz was barred by law from lobbying NEY, NEY's personal office staff, and the staff of the House Administration Committee for one year following Volz's resignation from Congress in February 2002. The actions that NEY encouraged Volz to take in violation of Volz's one-year lobbying ban included but are not limited to the following:

a. In approximately November 2001, NEY reviewed with Volz the clients Volz had told Abramoff that Volz could bring to Abramoff's lobbying firm. NEY encouraged Volz to add as a potential client a company with business before the Joint Committee on Printing, which NEY chaired.

b. Beginning in or about July 2002 and continuing at various times throughout his one-year lobbying ban, Volz contacted NEY and senior staff members of the House Administration Committee to seek support for transferring property held by the General Services Administration to a private school Abramoff operated. NEY agreed to help Abramoff with that effort, including by inserting an amendment into the HAVA and later by offering to call a senior official at GSA.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I am competent to make this statement and I do so knowingly and voluntarily and because I am in fact guilty of the crimes charged. I have discussed this factual basis with my attorneys, and I understand that

11

under the terms of the plea agreement this statement is admissible as evidence against me if my plea of guilty is not entered or if I otherwise fail to comply with the plea agreement.

DATE: September 13, 2006

Robert W. Ney

Mark H. Tuohey, Esq.
William E. Lawler III, Esq.
Craig D. Margolis, Esq.
David Hawkins, Esq.
Attorneys for Defendant