UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | 06cr272 (ESH) |
| | : | |
| **v.** | : | |
| | : | |
| **ROBERT W. NEY,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' SENTENCING MEMORANDUM

By plea agreement dated September 13, 2006, the parties jointly recommended to the Court all U.S. Sentencing Guidelines calculations save one: the amount of adjustment Defendant Ney should receive for his aggravated role in the offense pursuant to §3B1.1 of the Guidelines. To be clear, both parties agreed in paragraph 8(a) of the plea agreement that Defendant Ney should receive an adjustment for an aggravating role. The parties differed only as to the amount. The government agreed to recommend a three-level adjustment and the defendant agreed to only a two-level adjustment. In her draft Presentence Investigation Report, the Probation Officer has recommended the three-level adjustment sought by the United States. Accordingly, the United States submits this memorandum to address the law and the facts supporting application of a three-level role adjustment pursuant to the Sentencing Guidelines.[1]

---

[1] If the Court requests, the United States will submit prior to the sentencing hearing additional emails and documents that support the factual proffers made in this memorandum.

**I.    BACKGROUND**

On October 13, 2006, Defendant Ney pled guilty to a two-count Information charging him with a multi-object conspiracy in which he served as the central figure in several illicit schemes. Relevant to this memorandum are Defendant Ney's admissions that he conspired with Jack Abramoff, his lobbyists, and a foreign businessman, by corruptly soliciting and accepting things of value from these men in return for agreeing to take and taking various official actions.

Section 3B1.1 of the Sentencing Guidelines provides that a defendant will receive an upward adjustment if he played an aggravating role in an offense. The application of this adjustment requires a district court to make two findings: (1) a status determination, namely that the defendant exercised some control over another criminal participant, and (2) a scope determination, namely that the defendant participated in criminal activity that met either the numerosity or the extensiveness benchmarks established by the Guidelines. United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995). In criminal activity involving five or more participants, a defendant exercising control over another criminal participant will be given either a four-level adjustment for acting as a leader/organizer or a three-level adjustment for acting as a manager/supervisor. U.S.S.G. §§3B1.1(a), (b) (2003). A defendant exercising control over another criminal participant in criminal activity involving less than five participants and not otherwise extensive will receive only a two-level adjustment. Id. at §3B1.1(c).

Counsel for the government and the defendant have discussed the role adjustment and narrowed the scope of the parties' disagreement to a single issue, namely the number of criminal participants in Defendant Ney's criminal activity. The defendant agrees that the status determination has been met. In other words, the defendant agrees that he functioned as a

2

manager/supervisor over one other criminal participant, Neil Volz, and that the law requires that only one participant be managed/supervised. Defendant Ney disputes only the second finding necessary for a role adjustment, specifically whether the scope of the criminal activity to which he pled guilty involved five or more participants or was otherwise extensive. This memorandum, therefore, focuses on the law and facts supporting the numerosity and extensiveness finding.

**II.     LAW GOVERNING NUMEROSITY FINDING**

As with other adjustments under the Guidelines, the government need only establish by a preponderance of the evidence that the requirements for a role adjustment have been met. United States v. Graham, 162 F.3d 1180, 1182 (D.C. Cir. 1998).

The only issue now before the Court when selecting between the three-level adjustment sought by the government and two-level adjustment sought by the defendant is the number of participants involved in the criminal activity. If the activity involved five or more participants or was otherwise extensive in its scope, planning, or preparation, then the Guidelines mandate a three-level adjustment. To be clear, the Sentencing Guidelines do not allow the imposition of a two-level adjustment when the number of criminal participants equals or exceeds five. See United States v. Kirkeby, 11 F.3d 777, 778-779 (8th Cir. 1993) (concluding that five or more participants is extensive "as a matter of law"); see also U.S.S.G. §3B1.1, cmt. (discussing that the difference between the two-level adjustment on one hand and the three and four-level adjustments on the other is the "number of participants in the offense").

As the defendant concedes, in determining whether to apply a two-level or three-level adjustment, it is immaterial whether the defendant himself acted as a manager/supervisor of less

3

than five participants. So long as the defendant acted as a manager/supervisor of at least one other participant, and the criminal activity involved five or more participants, then a three-level adjustment is mandated by the Guidelines. See U.S.S.G. §3B1.1, app. note 2 ("to qualify for an adjustment ... the defendant must have been the ... manager []or supervisor of <u>one or more</u> other participants") (emphasis added); see also United States v. Hardamon, 188 F.3d 843, 851-52 (7th Cir. 1999) (holding that the defendant need supervise only one other participant in a criminal activity with five participants in order to trigger application of the three or four level adjustment); United States v. Cruz Camacho, 137 F.3d 1220, 1224 (10th Cir. 1998) (same); United States v. Smith, 49 F.3d 362, 367 (8th Cir. 1995) (same); United States v. Dota, 33 F.3d 1179, 1189 (9th Cir. 1994) (same).[2]

Similarly, it does not matter whether the defendant knew that the criminal activity involved five or more participants, so long as it in fact did. The three-level adjustment in §3B1.1 does not require that the defendant knew of the other participants, so long as he exercised control over at least one. United States v. Dota, 33 F.3d at 1189. Indeed, the adjustment does not even appear to require that the involvement of at least five participants was foreseeable to the defendant.[3] Id.

---

[2] In 1993, the Sentencing Commission added application note 2 to §3B1.1, clarifying that a defendant need only supervise one other participant in order to qualify for a role adjustment. That clarification resolved a circuit split existing in older cases about whether a defendant need exercise control over more than one other criminal participant in order to qualify for a role adjustment. See United States v. Cruz Camacho, 137 F.3d 1220, 1224 n. 3 (10th Cir. 1998) (finding that the then-new application note two overturned circuit precedent and was binding on federal courts' interpretation of the Guidelines).

[3] In this case, it seems clear both that Ney knew of the participation of the other participants and that their participation was reasonably foreseeable to him.

A "participant" in criminal activity is someone "who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. §3B1.1, App. Note 1. Unindicted coconspirators and acquitted codefendants are routinely labeled as participants for purposes of a role adjustment. See, e.g., United States v. Dota, 33 F.3d at 1189 (affirming application of a role adjustment when one of the participants was acquitted of all charges by the jury).

### III. FACTS MANDATING A FINDING THAT THE CRIMINAL ACTIVITY INVOLVED FIVE OR MORE PARTICIPANTS

Defendant Ney's plea documents show that the criminal activity to which Ney pled guilty involved five or more participants. The defendant pled guilty to a conspiracy to violate federal criminal laws, including by conspiring to deprive the public of the honest services of Defendant Ney and members of his staff. (Fact. Basis, Doc. No. 5 ¶8). All told, the criminal activity to which Defendant Ney pled guilty involved at least the following eight participants:

1. Defendant Ney;

2. Lobbyist Jack Abramoff (Fact. Basis, Doc. No. 5 ¶8);

3. Ney's former chief of staff Neil Volz (id.)

4. Lobbyist Michael Scanlon (id.);

5. Lobbyist Tony Rudy (id.);

6. A foreign businessman identified in the plea documents as the "Foreign Businessman" (id.);

7. Ney's most recent chief of staff, identified in the plea documents as "Staffer C" (id. ¶3); and

8. An unidentified staff member who traveled with Ney to gamble with the Foreign Businessman's money on two occasions in London in 2003 (id. ¶11).

The eight individuals listed above were criminal participants, to varying degrees, in the honest services fraud perpetrated by the defendant. Counsel for Defendant Ney concede only that three of those listed above were participants in Ney's criminal activity, specifically the defendant himself, Abramoff, and Volz (who was also supervised by Ney). Nonetheless, in his factual basis, the defendant identified three others – Scanlon, Rudy, and the Foreign Businessman – as those from whom he had "corruptly solicited and accepted a stream of things of value." (Fact. Basis, Doc. No. 5 ¶8). What follows is a discussion of some of the evidence establishing by more than a preponderance of the evidence that those three as well as the remaining two – Staffer C and the unidentified staffer who gambled in London – also qualify as participants in the defendant's criminal activity.[4]

A.    Scanlon's Participation in Congressional Record Statements

Scanlon has pled guilty to conspiring with Defendant Ney to defraud the public of the defendant's honest services. United States v. Scanlon, 05cr411 (D.D.C.). As Scanlon admitted in his own guilty plea, he repeatedly offered and gave things of value to Defendant Ney and his staff in return for the defendant's agreement to take official actions. United States v. Scanlon, 05cr411, Doc. No. 7, ¶¶4 and 5 (referring to Defendant Ney as "Representative #1"). One small part of Scanlon's role in the defendant's honest services fraud scheme is specifically mentioned

---

[4]In their objections to the draft Presentence Investigation Report, Counsel for Defendant Ney observe that the Clerk's office failed to give them notice that their client's case had been designated in the Clerk's office records as a matter related to the cases of Abramoff, Rudy, Scanlon, and Volz. It appears that the Clerk's designation of relatedness is a ministerial matter designed to ensure that a single judge is assigned all cases arising from a common event or transaction. See Rule LcrR 57.12 (discussing assignment of related cases to the same judge). Whatever the purpose of this rule, the Clerk's failure to comply with the notice provisions in the rule should have no bearing on this Court's determination of who else participated in Defendant Ney's offenses.

in Ney's plea papers, namely the defendant's agreement to insert two statements into the Congressional Record at Scanlon's request. (Fact. Basis, Doc. No. 5 ¶10b).

In the fall of 2000, Abramoff and his business partner Adam Kidan had just purchased a boat-based casino business in southern Florida. Previously, during Abramoff's quest to purchase the business, Abramoff had prevailed upon Defendant Ney to insert a statement into the Congressional Record criticizing the former owner in an effort to soften the negotiating position of that owner and secure a better deal. In the fall of 2000, however, Abramoff and Kidan wanted a second statement, this time praising Kidan as the new manager of the business. Scanlon's contemporaneous emails corroborate his plea agreement that, during an October 23, 2000, phone conversation with defendant Ney and his then chief of staff Volz, Scanlon offered them a $10,000 contribution to the National Republican Campaign Committee ("NRCC") in return for the defendant's agreement to insert the second statement into the Congressional Record. (Ex. 1 – October 23, 2000, emails between Abramoff and Scanlon). On October 26, 2000, the defendant inserted the statement requested by Scanlon. (Ex. 2 – October 26, 2000, Congressional Record extension of remarks). On approximately November 1, 2000, the business owned in part by Abramoff gave Ney a $10,000 check for the NRCC. As Scanlon admitted in his plea agreement, the $10,000 check was given in exchange for Ney's agreement to insert the October 26 Congressional Record statement. United States v. Scanlon, 05cr411, Doc. No. 7, ¶¶4d and 5c.

Similar email evidence confirms Scanlon's involvement in other aspects of Defendant Ney's honest services fraud scheme, including that Scanlon played a role in Defendant Ney's bid to insert legislation on behalf of a native American Tribal client from Texas ("Texas Tribe #1").

Such evidence establishes by a clear preponderance that Scanlon was a participant in Defendant Ney's honest services fraud scheme.

B.   Rudy's Participation in Legislative Amendments for Texas Tribe #1

Similar to Scanlon, Rudy has pled guilty to conspiring with Defendant Ney to defraud the public of the defendant's honest services.  United States v. Rudy, 06cr082 (D.D.C.)  (referring to Defendant Ney as "Representative #1").  As Rudy admitted in his own guilty plea, he offered and gave things of value to Defendant Ney and his staff in return for the defendant's agreement to take official actions.  United States v. Rudy, 06cr082, Doc. No. 5, ¶¶8 and 13.  Indeed, Rudy and Abramoff worked together to secure the defendant's agreement to insert legislative language on behalf of Abramoff's lobbying client, Texas Tribe #1, which action Defendant Ney agreed to take in his capacity as the House Conference Committee co-chair for the legislation which became the Help America Vote Act (the "HAVA").  Rudy later offered the defendant the golf trip to Scotland, which was paid for in part by money raised by Texas Tribe #1.

Specifically, on March 20, 2002, Rudy and Abramoff met with Defendant Ney and Staffer C to discuss Texas Tribe #1.  As the defendant admitted in his plea agreement, at that meeting he agreed to insert "an amendment to lift an existing federal ban against commercial gaming by a Texas Native American tribal client of Abramoff," which is referred to in the plea papers as "Texas Tribe #1."  (Fact. Basis, Doc. No. 5 ¶10a).  The following day, Rudy emailed Staffer C asking for the name of Defendant Ney's leadership political action committee ("PAC") and whether that committee could accept soft money.[5]  On March 26, 2002, Rudy emailed

---

[5]Prior to the November 6, 2002, effective date of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), there was no limit on the amount of money a PAC could receive so long as the money was to be put to a mixed purpose and not designated solely for use in federal campaigns.

Abramoff the name and address of the defendant's PAC, directing that Texas Tribe #1 make contributions to the PAC and the defendant's campaign committee totaling $32,000, including $25,000 in unregulated soft money to the defendant's PAC, the $5,000 maximum contribution in hard money to the defendant's PAC, and the $2,000 maximum contribution to the defendant's election committee.

Subsequent to securing Defendant Ney's agreement to insert gaming legislation, but before the defendant had attempted to insert the legislation into the HAVA, Rudy offered Defendant Ney the single most expensive thing of value given by Abramoff and his coconspirator lobbyists to the defendant: the 2002 Scotland golf trip. (Fact. Basis, Doc. No. 5 ¶9a (trip costs for Defendant Ney and seven others exceeded $160,000)).

Defendant Ney admitted that he falsified the travel disclosure form required by the Rules of the House of Representatives for this trip by "substantially under report[ing] the costs paid by Abramoff and his clients and mischaracteriz[ing] the purpose of the trip." (Fact. Basis, Doc. No. 5 ¶12a). Indeed, the travel disclosure form falsely reported that the Scotland trip was sponsored by the "National Center for Public Policy," and it under-reported the cost of the trip, omitted any costs incurred by golfing, and misrepresented that the purpose of the trip was to meet with Scottish Parliamentarians. (Ex. 3 – defendant's September 9, 2002, travel disclosure form).

---

Money designated for a mixed purpose, such as generic party advertising intended to influence both state and federal elections, was referred to as "soft money." McConnell v. FEC, 540 U.S. 93, 122-123 (2003). There also was no requirement to report soft money donations to the FEC. "Hard money" was the colloquial description for money intended solely for use in a federal campaign, and a person could donate a maximum of $5,000 in "hard money" to a PAC in any calendar year. 2 U.S.C. § 441a(1)(C) (2002).

These and other facts establish by well more than a preponderance that Rudy was a participant in Ney's honest services fraud scheme.

  C. <u>Foreign Businessman's Participation in Defendant's London Gambling Trips</u>

In his plea agreement, Defendant Ney admitted soliciting and accepting from the Foreign Businessman, on two occasions, "thousands of dollars worth of gambling chips for use at various private casinos" in London. (Fact. Basis, Doc. No. 5 ¶¶13c and g). Ney admitted that he "never returned any of the free chips to the Foreign Businessman and never shared with the Foreign Businessman any" of the more than $50,000 that Defendant Ney pocketed as a result. (<u>Id.</u>). Ney also admitted that, after receiving the first payment of gambling chips in February 2003, he twice contacted the State Department to make inquiries on behalf of the Foreign Businessman. (<u>Id.</u> ¶¶13d and e). Defendant Ney chose to repay the Foreign Businessman not with the money he won but with another type of currency – his official actions. The defendant's admissions, combined with corroborating bank and casino records and common sense, establish beyond a mere preponderance that the Foreign Businessman was a knowing participant in Defendant Ney's honest services fraud scheme. The fact that Defendant Ney did not directly involve the Foreign Businessman in his concealment of these payments does not exculpate the Foreign Businessman.

  D. <u>Staffer C's Participation in Defendant's Honest Services Fraud Scheme</u>

Staffer C succeeded Volz as Defendant Ney's chief of staff, serving from February 2002 until July 2006. In that position, Staffer C enjoyed and coordinated the receipt of many of the things of value offered and given to Defendant Ney by Abramoff, his lobbyists, and the Foreign Businessman, including the trips to Scotland, Lake George, and New Orleans. In return, Staffer

C aided and assisted Defendant Ney with many of the official acts Defendant Ney corruptly provided in return. Staffer C's role in the corrupt relationship is well illustrated by his role in the defendant's May 2003 trip to gamble and vacation in New Orleans (Fact. Basis, Doc. No. 5 ¶ 9a), the defendant's second trip to gamble with the Foreign Businessman in London in August 2003 (id. ¶11g), and the defendant's efforts on behalf of Abramoff's Russian clients (see generally id. ¶10d (discussing in general terms the defendant's contacts with Executive Branch agencies on behalf of Abramoff and his lobbyists)). Staffer C also crafted with Defendant Ney some of the misleading disclosure reports the defendant filed with the House of Representatives.

In May 2003, Defendant Ney, Staffer C, Volz, and one other traveled to New Orleans for three nights at Abramoff and his clients' expense. Staffer C scheduled the trip to provide a vacation for Defendant Ney. As the defendant admitted, the trip was to gamble and vacation, and it cost approximately $7,200. (Fact. Basis, Doc. No. 5 ¶9a).

In addition, as further proof of Staffer C's participation in Ney's scheme, in late summer 2003, Defendant Ney traveled to Russia as part of a Congressional Delegation. On July 28, 2003, shortly before the trip, Staffer C emailed a lobbyist working with Abramoff and asked whether there was "anything we can do" while in Russia on behalf of a client identified in Ney's plea documents as a "foreign beverage distiller." (Ex. 4 – July 28, 2003, email from Staffer C to lobbyist). A day later, Volz emailed Abramoff that Staffer C and Defendant Ney would instead meet with two of Abramoff's Russian clients during the trip at the request of Abramoff and his lobbyists. As later emails make clear, Defendant Ney and Staffer C took steps to help Abramoff's Russian clients, including by contacting the American consulate in Moscow in order to speed the travel visa application of a family member of one of Abramoff's Russian clients.

(Ex. 5 – August 1, 2003, email from Volz to Abramoff and another lobbyist recounting the defendant's description of action he took to get a passport out of the American consulate). Staffer C and Defendant Ney took these steps after having been promised and shortly before enjoying a vacation in Lake George, New York, in August 2003, with trip costs exceeding $3,500 paid by Volz and another lobbyist. (Fact. Basis, Doc. No. 5 ¶9a).

Finally, in his factual basis, the defendant admitted that Staffer C accepted things of value as part of Ney's honest services fraud, including thousands of dollars worth of gambling chips during the August 2003 trip to gamble with the Foreign Businessman in London, which was discussed above. (Fact. Basis, Doc. No. 5 ¶11(g)).

These and other incidents illustrate Staffer C's knowing participation in the defendant's criminal activity.

E.    Unidentified Staffer's Participation in Defendant's London Gambling Trips

As Defendant Ney admitted in his plea agreement, another unidentified staff member accompanied the defendant on both his February 2003 and August 2003 trips to London. (Fact. Basis, Doc. No. 5 ¶11). Like the defendant, on both occasions this unidentified staffer accepted thousands of dollars worth of gambling chips from the Foreign Businessman. On the return to the United States from the August 2003 gambling trip, this unidentified staffer agreed to carry approximately $5,000 worth of British pounds through a U.S. Customs Service checkpoint so that the defendant could carry and report a lower dollar amount. (Id.). Defendant Ney explained that the $32,000 he reported on required U.S. Customs Service forms did not include the approximately $5,000 worth of British pounds that he had given to this unidentified staffer. (Id.). This evidence alone establishes beyond a preponderance that this unidentified staffer was a

knowing participant in the defendant's scheme, including his efforts to conceal their receipt of the things of value from the Foreign Businessman.

## IV.   LAW AND FACTS ESTABLISHING THAT SCHEME WAS "OTHERWISE EXTENSIVE"

On the facts in this case, the Court could apply the three-level adjustment to Defendant Ney using a wholly separate scope finding, namely that the criminal activity was "otherwise extensive" as that phrase has been defined in the Guidelines and case law.  United States v. Wilson, 240 F.3d 39 (D.C. Cir. 2001).  The test in this Circuit is whether the number of knowing and unknowing participants totals at least five combined with an analysis of the role, performance, and number of unknowing participants.  United States v. Wilson, 240 F.3d at 47 (citing with approval United States v. Carrozella, 105 F.3d 796, 802 (2d Cir. 1997)).  Specifically, the following criteria are relevant:

> (1) the number of unknowing participants; (2) the number of unknowing participants whose activities were organized by or led by the defendant with specific criminal intent [as opposed to mere service providers]; and (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme [rather than fungible with others generally available to the public].

Id. at 51 (brackets in original).

In Wilson, the case involved a scheme by the defendant and one complicit bank employee to fraudulently obtain credit cards, ATM cards, and check cards issued in the names of other people.  Further, the conduct was limited to a few banks and lasted only short periods of time, in part because one of the banks detected the fraud.  The Court held that the scheme was not "otherwise extensive" because there was only one criminal participant in addition to the defendant and, although there were more than five persons involved, the innocent bank

employees who opened accounts and changed addresses for the defendant were not organized or led by the defendant but were only following routine bank procedures.

By contrast here, even the defendant concedes there are three criminal participants. Further, his plea agreement establishes that at least five others were involved, including Staffer C and the other unidentified staffer who traveled to London in February and August 2003 to gamble. The conduct of Staffer C, the other unidentified staffer, and countless other staff members in Defendant Ney's former offices were peculiar and necessary to the success of Defendant Ney's scheme. Many of these staff members assisted Defendant Ney in attempting to insert non-germane language into the HAVA at his direction during its consideration by the Conference Committee, inserting statements into the Congressional Record, meeting with Abramoff and his clients on a variety of issues, and communicating with Abramoff and his clients, none of whom were from or connected in any way with Ohio. Moreover, Defendant Ney accepted thousands of dollars worth of benefits in a scheme that spanned two continents, lasted almost four and one-half years, implicated numerous separate transactions, and involved numerous acts of deceit and concealment, including false forms filed by members of Defendant Ney's staff over several reporting periods. Thus, while there is clear evidence beyond a preponderance to establish that Defendant Ney's sentence should be enhanced by three levels for his role in a scheme involving at least five criminal participants, there is also sufficient evidence for an independent application of that adjustment based on a finding that the criminal activity in which Defendant Ney participated was "otherwise extensive."

**V.      CONCLUSION**

For the foregoing reasons, the United States submits that Defendant Ney's criminal activity involved five or more participants and, as such, is subject to the three-level adjustment mandated by the Guidelines.  Focusing only on the aspect of Abramoff's criminal conduct in which Defendant Ney directly participated as well as the defendant's relationship with the Foreign Businessman (in which Abramoff played no direct part), the evidence of at least eight criminal participants is overwhelming.  The defendant concedes that there were three participants: himself, Abramoff, and Volz.  Two additional participants – Scanlon and Rudy – have pled guilty to conspiring with Defendant Ney and their guilty pleas are corroborated by documents and emails.  Those two alone would bring the total number of participants to five with the addition of the three individuals who the defendant agrees participated in the scheme.

Two more participants – Staffer C and the unidentified staff member – were supervised/managed by the defendant. The final participant – the Foreign Businessman – paid the defendant for official action. Moreover, the scheme in which Defendant Ney participated was "otherwise extensive." In short, the facts readily support application of the three-level role adjustment to Defendant Ney. The government stands ready to provide additional supporting emails and documents in advance of the sentencing hearing if the Court requests.

          EDWARD C. NUCCI
          Acting Chief, Public Integrity Section

          STEVEN A. TYRRELL
          Acting Chief, Fraud Section


          ___/s/ (M. Kendall Day)_____
          Mary K. Butler
          James A. Crowell IV
          M. Kendall Day
          Trial Attorneys
          Criminal Division
          U.S. Department of Justice

CERTIFICATE OF SERVICE

I certify that on this 3rd Day of January, 2007, a copy of the foregoing memorandum was delivered to William Lawler, wlawler@velaw.com, Counsel for Defendant Ney, via the CM/ECF electronic mail system.

       (M. Kendall Day)
M. Kendall Day
Trial Attorney